J. Mervin HARDEN, Plaintiff–Appellee,

v.

TRW, INC., a corporation, Defendant–Appellant.

No. 91–8583.

United States Court of Appeals, Eleventh Circuit.

April 24, 1992.

David E. Hudson, Hull Towill Norman & Barrett, Augusta, Ga., for defendant-appellant.

William R. Coleman, Jr., Stephen E. Curry, Augusta, Ga., for plaintiff-appellee.

Before COX, Circuit Judge, JOHNSON * and REAVLEY **, Senior Circuit Judges.

JOHNSON, Senior Circuit Judge:

This case concerns two claims, one sounding in contract and one in quantum meruit, brought by J. Mervin Harden against TRW, Inc. After trial, a jury awarded plaintiff/appellee Harden $166,-090 on a quantum meruit theory, and the district court entered judgment on the jury's verdict. Defendant TRW brought this appeal following the district court's denial of its motion for judgment notwithstanding the verdict ("judgment n.o.v.") or in the alternative a new trial. We reverse and remand for a new trial.

## I. STATEMENT OF THE CASE

TRW manufactures replacement parts for automobiles and sells them to warehouse distributors. Warehouse distributors in turn sell to jobbers,[1] such as the plaintiff.

In November 1983, Evern Beech, who was then a district sales manager for TRW, visited Harden at his store in Augusta, Georgia. The purpose for Beech's visit was to commence preparations for Harden's "changeover"[2] to TRW. While surveying Harden's inventory, Beech was surprised to find TRW parts already on the shelves in large quantities. Beech's surprise was transformed into outright concern in January or February of 1984 when Harden showed Beech his warehouse. At Harden's warehouse, Beech observed a very sizeable quantity of TRW parts that had been returned to its Hub Park facility, deemed to be non-sellable,[3] and sent to be

---

* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable Thomas M. Reavley, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. Jobbers supply automobile dealerships, automotive repair shops, and retailers of automobile parts.

2. A "changeover" occurs when a jobber switches to TRW's brand of automobile parts. During a changeover, TRW inventories the jobber's parts and sends them to its Hub Park facility in Ohio. There, the parts are separated into sellable and non-sellable parts. TRW reboxes and resells the sellable parts, regardless of what brand they were originally. TRW sends the non-sellable parts to be destroyed.

3. Non-sellable parts fall into three main categories: obsolete, overstock, and defective. A part is considered obsolete if TRW no longer markets it. Overstock parts constitute those of which TRW has already manufactured enough

destroyed. Apparently, someone had intercepted these parts prior to their scheduled destruction in order to recirculate them.

Much later, in March of 1985, TRW ordered Beech to return to Harden's warehouse to learn more about the source of the recirculated parts.[4] Harden told Beech that he had bought the parts from Stanley Schube who ran a warehouse in Atlanta. Beech performed a preliminary investigation of Schube's warehouse and determined that it contained a large quantity of recirculated TRW parts. Subsequently, in October 1985, TRW sent Dennis Gladin, then TRW's Director of Operations for the After–Market Division, to speak with Harden about TRW's problem with recirculated parts. Harden agreed to sell his recirculated parts to TRW at the price he paid for them, $60,000, and to accept $1,800 as a lease payment so TRW could store those parts at Harden's warehouse for a time. Gladin also discussed with Harden the possibility of Harden's aiding TRW in its investigation of the recirculated parts. The parties dispute certain parts of these negotiations, but they both contend that Harden agreed to help Beech in the investigation in exchange for "one percent" of some measure of the value of the recirculated parts that were recovered or located during the investigation. Pursuant to these negotiations Harden and Beech, posing as interested buyers of recirculated parts, made six trips to Schube's warehouse between November 1985 and January 1986.[5] During these trips, Harden and Beech verified that Schube possessed a very large quantity of recirculated TRW parts, they convinced Schube to reveal his source for the recirculated TRW parts, and, using TRW's funds, they made a $30,000 purchase of recirculated TRW parts for TRW. After April 1986, TRW did not contact Harden in connection with the investigation save for a letter from Gladin in January 1987. That letter contained a check for $112 purporting to compensate Harden in full for his services in the investigation.

Thereafter, Harden commenced this suit against TRW on the dual theories of contract and quantum meruit. In a special verdict, the jury determined that no express contract existed between the parties and that Harden had bestowed a benefit of $166,090 on TRW. The district court entered judgment on the jury's verdict and subsequently denied TRW's motion for judgment n.o.v. or in the alternative a new trial. This timely appeal followed.

## II. ISSUES

TRW argues that the district court erred on two grounds in denying TRW's post-judgment motion. First, TRW argues that the evidence in the case required the jury to find an express contract, thereby barring a finding of quantum meruit liability. In the alternative, TRW contends that the size of the quantum meruit recovery could not be reasonably calculated from the evidence adduced at trial.[6]

## III. STANDARDS OF REVIEW

■■■ This Court reviews the denial of a motion for judgment n.o.v. *de novo*, considering all of the evidence, but in a light most favorable to the non-movant. *Braswell v. Conagra, Inc.*, 936 F.2d 1169, 1172 (11th Cir.1991). We will reverse only if "the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict." *Brady v. Southern Ry.*, 320 U.S. 476, 479, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943). On the other hand, this Court will reverse the denial of a motion for new trial only if the district court abused its discretion in determining that the verdict was not "contrary to the great weight of the evidence." *Watts v. Great Atlantic & Pacif-*

---

to satisfy market demand for the foreseeable future. Defective parts contain flaws.

**4.** We use the term "recirculated parts" to indicate parts that TRW had sent to be destroyed but were diverted.

**5.** In March or April 1986, Harden also made one trip to Philadelphia to search for another possible source of recirculated parts.

**6.** Because we dispose of this appeal on TRW's first ground, we do not reach the issue regarding the size of the quantum meruit recovery.

*ic Tea Co.,* 842 F.2d 307, 310 (11th Cir. 1988).

## IV.  ANALYSIS [7]

■ TRW argues that reasonable persons could not find the absence of an express contract and that such a finding precludes a quantum meruit recovery. We agree.

■ An express contract precludes recovery on a quantum meruit theory. *Lord Jeff Knitting Co. v. Lacy,* 195 Ga.App. 287, 393 S.E.2d 55, 56 (1990). However, a plaintiff is entitled to submit both theories to the jury if there is sufficient evidence to support them both. *Rader v. H. Boyer Marx & Assoc.,* 142 Ga.App. 97, 235 S.E.2d 690, 692 (1977). Nevertheless, where the evidence is overwhelming, a court may find the existence of an express contract, as a matter of law, and thereby preclude a quantum meruit recovery. *Classic Restorations, Inc. v. Bean,* 155 Ga.App. 694, 272 S.E.2d 557, 562 (1980).

■ The evidence introduced at the trial below clearly shows that the parties disputed the compensation due Harden under the alleged contract. First, the jury heard Beech testify that Gladin had told him that Gladin offered to pay Harden one percent of the "warehouse distributor value" [8] of all the parts "located." Beech also claimed that Gladin never mentioned "scrap value" [9] to him. Then Harden took the stand

and testified that Gladin offered him one percent of the "cost" (which he understood to mean "warehouse price") of the parts "recovered." Later in his testimony, however, Harden stated that he thought he "was going to be paid one percent of the recovery and information leading to any recovery." Harden further testified that Gladin failed to mention "salvage value" to him and that he was not even familiar with that term. Finally, TRW called Gladin to the stand and he testified that he offered Harden one percent of the "recovered value" of only the parts recovered, not of all those located. Gladin added that, although he did not mention "scrap value" to Harden, he did tell Harden that TRW would "run [the recovered parts] through our system [of separating sellable parts from nonsellable ones] and the recovered material would be value[d] and [Harden's compensation] would be one percent of that value." [10] Gladin conceded, however, that "it probably would [have been] reasonable" for Harden to have thought his compensation was going to be one percent of the warehouse value of the recovered parts. Thus, the evidence indicated that the price of Harden's services was to be one percent of either the salvage or the warehouse value of the recirculated parts that were recovered or located.

Despite the conflicting testimony regarding the compensation due Harden,[11] the

---

7. Georgia law governs the substantive aspects of this diversity case because all of the events surrounding this case occurred in Georgia, and suit was brought in Georgia. *See General Electric Credit Corp. v. Home Indemnity Co.,* 168 Ga.App. 344, 309 S.E.2d 152, 157 (1983).

8. Terms such as "warehouse distributor value," "warehouse value," and "warehouse price" were used interchangeably throughout the trial to connote what TRW called "warehouse distributor price" or "WD net." According to Larry Davis, TRW's Supervisor of Accounting Services, this is the price that TRW charged warehouses for parts in the first instance, and it is also the price that TRW paid warehouses when they returned parts pursuant to TRW's return policy. This return policy allowed warehouses to return five percent of their annual purchases. The parts returned could be from any manufacturer, and they need not be defective. TRW paid

"warehouse price" for parts returned regardless of whether they were sellable.

9. The terms "scrap value" and "salvage value" were used interchangeably throughout the trial to connote the value to TRW of only the portion of the returned parts that TRW deemed sellable.

10. The jury also considered the letter written by Gladin to Harden in January 1987, which accompanied a $112 check. Referring to the October 1985 negotiations, the letter stated, "[s]ome time ago, we discussed a 1% finder's fee of material which was salvaged by TRW."

11. Harden argues that the conflicting testimony entitled the jury to find the contract unenforceable because it was based on a mutual mistake of fact. *See* O.C.G.A. § 13–5–4 (1982). This contention lacks merit. A mutual mistake of fact occurs when both parties to a contract have a mistaken belief regarding "a basic assumption

jury was not entitled to find the absence of an express contract between TRW and Harden.[12] The case of *Venable v. Block*, 138 Ga.App. 215, 225 S.E.2d 755 (1976), is controlling. In *Venable*, the plaintiff sued the defendant, an attorney, alleging that the defendant had breached their contract whereby he was to represent the plaintiff in a tort suit on a contingency fee basis. *Id.*, 225 S.E.2d at 756. The trial court granted summary judgment to the plaintiff as to liability, and the defendant appealed. *Id.* He claimed that although he had agreed to represent the plaintiff on a contingency fee basis, the parties never reached a meeting of the minds as to the amount of the contingency fee and therefore the contract was unenforceable.[13] *Id.* at 756–57. The Georgia Court of Appeals disagreed:

> We find the oral exchange of promises to be sufficient consideration. The fact that the promises were based on a contingency will not affect its validity as consideration. However, an alleged contract on which there is no firm agreement as to consideration is unenforceable. Although this is the general law on this

issue, we find this contract to be enforceable where consideration is admitted and there is disagreement only as to whether there was common agreement as to the specific amount of consideration in a parol contract.

.   .   .   .   .

> Where there is a conflict in the evidence as to what the specific terms of an oral contract are, including that of consideration, this is a question for the jury—all other essentials of a valid oral agreement being present. We find all of the essentials of an oral contract to be present—with only the issue of whether there was agreement on the specific amount of consideration being in dispute. That is a proper issue for the jury.

*Id.* at 757 (citations omitted).

■ In the case at bar, as in *Venable*, it is undisputed that the parties exchanged oral promises. Harden promised to aid in the investigation of the recirculated parts and Gladin promised that TRW would pay Harden one percent of a disputed amount.[14] Furthermore, in both cases, the only factual dispute concerns whether the parties

on which the contract was made [that] has a material effect on the agreed exchange of performances." Restatement (Second) of Contracts, § 152 (1979). For example, if two parties form a contract for the purchase of land, "the value of which has depended mainly on the lumber on it," and both parties "believe that the timber is still there, but in fact it has been destroyed by fire," their contract is voidable. *Id.*, cmt. b, illus. 1. *Cf. State Highway Dept. v. MacDougald Constr. Co.*, 102 Ga.App. 254, 115 S.E.2d 863 (1960). Here the only issue is not one of mutual mistake of a fact underlying the bargain, but one of mutual assent regarding the price term.

**12.** Harden's purported authority to the contrary is clearly distinguishable. Harden's reliance on *Sharp–Boylston v. Lundeen*, 145 Ga.App. 672, 244 S.E.2d 622 (1978), is misplaced because the plaintiff sought recovery for services rendered that were clearly beyond the terms of the contract. 244 S.E.2d at 624. Such is not the case here. *See infra* note 14. Harden also relies on *Ghee v. Kimsey*, 179 Ga.App. 446, 346 S.E.2d 888 (1986). That case, however, is clearly distinguishable from this one because, in *Ghee*, the defendants denied that there had been any agreement whatsoever with the plaintiff, 346

S.E.2d at 889–90, whereas in this case both parties admitted that they exchanged oral promises and reached agreement regarding all aspects of the contract except one portion of the price term.

**13.** The plaintiff in *Venable* contended that the parties initially agreed that the defendant would receive one-third of the recovery, but that the defendant later told her that he would take only one-fourth of the recovery. *Id.* at 757.

**14.** Harden contends that the jury was entitled to find TRW liable in quantum meruit for services he performed that were beyond the contract. *See Lord Jeff Knitting*, 393 S.E.2d at 56. Harden claims that the jury could have found, based on Gladin's testimony, that the contract called for Harden merely to make one purchase for TRW from Schube and that Harden's gathering of information from Schube was extra work beyond the contract. Harden relies, however, on a minute portion of Gladin's testimony taken out of context and conveniently overlooks Gladin's unequivocal testimony that he retained Harden "for the purpose of helping us undercover [sic] information about what was going on and we asked him to make one buy for us for $30,000."

agreed on a particular component of a contingency fee term in the contract.[15]  Therefore, the jury could not reasonably have concluded that there was no express contract.[16]  This leaves but one reasonable conclusion as to the verdict on the quantum meruit claim, and we therefore instruct the district court to enter judgment for TRW on that claim.  *See Brady,* 320 U.S. at 478, 64 S.Ct. at 233.  With regard to the contract claim, however, the record evidence in this case allows for more than one reasonable outcome, and consequently we direct the district court to hold a new trial on that claim.  *See Neely v. Martin K. Eby Constr. Co.,* 386 U.S. 317, 329, 87 S.Ct. 1072, 1080, 18 L.Ed.2d 75 (1967) (court of appeals that reverses judgment entered by district court over motion for judgment n.o.v. may order new trial on its motion).

## V.  CONCLUSION

We REVERSE the judgment entered on the verdict below and REMAND with instructions to enter judgment for TRW on the quantum meruit claim and to hold a new trial on the contract claim.

---

15.  Moreover, in both cases, the evidence yielded a limited choice of discrete possibilities regarding the disputed term.  In *Venable,* the jury had to choose between a one-third and one-fourth contingency fee and, in this case, the jury should have determined whether Harden's one percent was to be derived from the salvage or the warehouse value of the parts recovered or located.

16.  Harden argues that, even if the jury was bound to find the existence of a contract, it was entitled to find TRW liable in quantum meruit because TRW terminated the contract prematurely.  *See Henry v. Moss,* 99 Ga.App. 623, 109 S.E.2d 313, 315 (1959).  However, because there was no evidence adduced at trial regarding a definite duration of the contract, it was terminable at will.  *See Guinn v. Conwood Corp.,* 185 Ga.App. 41, 363 S.E.2d 271, 272 (1987); *West Virginia Glass Specialty Co. v. Guice & Walshe, Inc.,* 170 Ga.App. 556, 317 S.E.2d 592, 594 (1984); *Hans Godo Frabel, Inc. v. Brennan's of Atlanta, Inc.,* 151 Ga.App. 379, 259 S.E.2d 649, 650 (1979); *Blackstock v. Atlanta Newspapers, Inc.,* 94 Ga.App. 313, 94 S.E.2d 389, 390 (1956).